(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LIU ET AL. *v.* SECURITIES AND EXCHANGE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 18–1501. Argued March 3, 2020—Decided June 22, 2020

To punish securities fraud, the Securities and Exchange Commission is authorized to seek "equitable relief" in civil proceedings, 15 U. S. C. §78u(d)(5). In *Kokesh* v. *SEC*, 581 U. S. ___, this Court held that a disgorgement order in a Securities and Exchange Commission (SEC) enforcement action constitutes a "penalty" for purposes of the applicable statute of limitations. The Court did not, however, address whether disgorgement can qualify as "equitable relief" under §78u(d)(5), given that equity historically excludes punitive sanctions.

Petitioners Charles Liu and Xin Wang solicited foreign nationals to invest in the construction of a cancer-treatment center, but, an SEC investigation revealed, misappropriated much of the funds in violation of the terms of a private offering memorandum. The SEC brought a civil action against petitioners, seeking, as relevant here, disgorgement equal to the full amount petitioners had raised from investors. Petitioners argued that the disgorgement remedy failed to account for their legitimate business expenses, but the District Court disagreed and ordered petitioners jointly and severally liable for the full amount. The Ninth Circuit affirmed.

*Held*: A disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under §78u(d)(5). Pp. 5–20.

(a) In interpreting statutes that provide for "equitable relief," this Court analyzes whether a particular remedy falls into "those categories of relief that were *typically* available in equity." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256. Relevant here are two principles of equity jurisprudence. Equity practice has long authorized courts to strip wrongdoers of their ill-gotten gains. And to avoid transforming that

remedy into a punitive sanction, courts restricted it to an individual wrongdoer's net profits to be awarded for victims. Pp. 5–14.

(1) Whether it is called restitution, an accounting, or disgorgement, the equitable remedy that deprives wrongdoers of their net profits from unlawful activity reflects both the foundational principle that "it would be inequitable that [a wrongdoer] should make a profit out of his own wrong," *Root* v. *Railway Co.,* 105 U. S. 189, 207, and the countervailing equitable principle that the wrongdoer should not be punished by "pay[ing] more than a fair compensation to the person wronged," *Tilghman* v. *Proctor,* 125 U. S. 136, 145–146. The remedy has been a mainstay of equity courts, and is not limited to cases involving a breach of trust or fiduciary duty, see *Root,* 105 U. S., at 214. Pp. 6–9.

(2) To avoid transforming a profits award into a penalty, equity courts restricted the remedy in various ways. A constructive trust was often imposed on wrongful gains for wronged victims. See, *e.g.*, *Burdell* v. *Denig,* 92 U. S. 716, 720. Courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory. See, *e.g.*, *Ambler* v. *Whipple*, 20 Wall. 546, 559. Finally, courts limited awards to the net profits from wrongdoing after deducting legitimate expenses. See, *e.g.*, *Rubber Co.* v. *Goodyear*, 9 Wall. 788, 804. Pp. 9–12.

(3) Congress incorporated these longstanding equitable principles into §78u(d)(5), but courts have occasionally awarded disgorgement in ways that test the bounds of equity practice. Petitioners claim that disgorgement is necessarily a penalty under *Kokesh*, and thus not available at equity. But *Kokesh* expressly declined to reach that question. The Government contends that the SEC's interpretation has Congress' tacit support. But Congress does not enlarge the breadth of an equitable, profit-based remedy simply by using the term "disgorgement" in various statutes. Pp. 12–14.

(b) Petitioners briefly claim that their disgorgement award crosses the bounds of traditional equity practice by failing to return funds to victims, imposing joint-and-several liability, and declining to deduct business expenses from the award. Because the parties did not fully brief these narrower questions, the Court does not decide them here. But certain principles may guide the lower courts' assessment of these arguments on remand. Pp. 14–20.

(1) Section 78u(d)(5) provides limited guidance as to whether the practice of depositing a defendant's gains with the Treasury satisfies its command that any remedy be "appropriate or necessary for the benefit of investors," and the equitable nature of the profits remedy gen-

erally requires the SEC to return a defendant's gains to wronged investors. The parties, however, do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would be for the benefit of investors and consistent with equitable principles. Pp. 14–17.

(2) Imposing disgorgement liability on a wrongdoer for benefits that accrue to his affiliates through joint-and-several liability runs against the rule in favor of holding defendants individually liable. See *Belknap* v. *Schild*, 161 U. S. 10, 25–26. The common law did, however, permit liability for partners engaged in concerted wrongdoing. See, *e.g.*, *Ambler*, 20 Wall., at 559. On remand, the Ninth Circuit may determine whether the facts are such that petitioners can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required. Pp. 17–18.

(3) Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when both the receipts and payments are taken into the account." *Goodyear*, 9 Wall., at 804. When the "entire profit of a business or undertaking" results from the wrongdoing, a defendant may be denied "inequitable deductions." *Root*, 105 U. S., at 203. Accordingly, courts must deduct legitimate expenses before awarding disgorgement under §78u(d)(5). The District Court below did not ascertain whether any of petitioners' expenses were legitimate. On remand, the lower courts should examine whether including such expenses in a profits-based remedy is consistent with the equitable principles underlying §78u(d)(5). Pp. 18–20.

754 Fed. Appx. 505, vacated and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, ALITO, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a dissenting opinion.

1

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 18–1501

---

## CHARLES C. LIU, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2020]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In *Kokesh* v. *SEC*, 581 U. S. \_\_\_ (2017), this Court held that a disgorgement order in a Securities and Exchange Commission (SEC) enforcement action imposes a "penalty" for the purposes of 28 U. S. C. §2462, the applicable statute of limitations. In so deciding, the Court reserved an antecedent question: whether, and to what extent, the SEC may seek "disgorgement" in the first instance through its power to award "equitable relief" under 15 U. S. C. §78u(d)(5), a power that historically excludes punitive sanctions. The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under §78u(d)(5). The judgment is vacated, and the case is remanded for the courts below to ensure the award was so limited.

I

A

Congress authorized the SEC to enforce the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. §77a *et seq.*, and the Securities Exchange Act of 1934, 48 Stat. 881,

as amended, 15 U. S. C. §78a *et seq.*, and to punish securi-
ties fraud through administrative and civil proceedings.  In
administrative proceedings, the SEC can seek limited civil
penalties and "disgorgement."    See §77h–1(e) ("In any
cease-and-desist proceeding under subsection (a), the Com-
mission may enter an order requiring accounting and dis-
gorgement"); see also §77h–1(g) ("Authority to impose
money penalties").  In civil actions, the SEC can seek civil
penalties and "equitable relief."  See, *e.g.*, §78u(d)(5) ("In
any action or proceeding brought or instituted by the Com-
mission under any provision of the securities laws, . . .  any
Federal court may grant . . . any equitable relief that may
be appropriate or necessary for the benefit of investors");
see also §78u(d)(3) ("Money penalties in civil actions" (quo-
tation modified)).

Congress did not define what falls under the umbrella of
"equitable relief."  Thus, courts have had to consider which
remedies the SEC may impose as part of its §78u(d)(5) pow-
ers.

Starting with *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d
1301 (CA2 1971), courts determined that the SEC had au-
thority to obtain what it called "restitution," and what in
substance amounted to "profits" that "merely depriv[e]" a
defendant of "the gains of . . . wrongful conduct."  *Id.*, at
1307–1308.  Over the years, the SEC has continued to re-
quest this remedy, later referred to as "disgorgement,"[1] and

---

[1] Courts have noted the relatively recent vintage of the term "disgorge-
ment."    See, *e.g.*, *SEC* v. *Cavanaugh*, 445 F. 3d 105, 116, n. 24 (CA2
2006).  The dissent contends that this recency in terminology alone re-
moves disgorgement from the class of traditional equitable remedies,
*post*, at 4 (opinion of THOMAS, J.), despite seeming to recognize disgorge-
ment's parallels to restitution-based awards well within that class, *post*,
at 4–5.  It is no surprise that the dissent notes such parallels, given this
Court's acknowledgment that "disgorgement of improper profits" is "a
remedy only for restitution" that is "traditionally considered . . . equita-
ble."  *Tull* v. *United States*, 481 U. S. 412, 424 (1987); see also *infra*, at 7.

courts have continued to award it.  See *SEC* v. *Commonwealth Chemical Securities, Inc.*, 574 F. 2d 90, 95 (CA2 1978) (explaining that, when a court awards "[d]isgorgement of profits in an action brought by the SEC," it is "exercising the chancellor's discretion to prevent unjust enrichment"); see also *SEC* v. *Blatt*, 583 F. 2d 1325, 1335 (CA5 1978); *SEC* v. *Washington Cty. Util. Dist.*, 676 F. 2d 218, 227 (CA6 1982).

   In *Kokesh*, this Court determined that disgorgement constituted a "penalty" for the purposes of 28 U. S. C. §2462, which establishes a 5-year statute of limitations for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture."  The Court reached this conclusion based on several considerations, namely, that disgorgement is imposed as a consequence of violating public laws, it is assessed in part for punitive purposes, and in many cases, the award is not compensatory.  581 U. S., at \_\_\_–\_\_\_ (slip op., at 7–9).  But the Court did not address whether a §2462 penalty can nevertheless qualify as "equitable relief" under §78u(d)(5), given that equity never "lends its aid to enforce a forfeiture or penalty."  *Marshall* v. *Vicksburg*, 15 Wall. 146, 149 (1873).  The Court cautioned, moreover, that its decision should not be interpreted "as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings."  *Kokesh*, 581 U. S., at \_\_\_, n. 3 (slip op., at 5, n. 3).  This question is now squarely before the Court.

―――――――

The dissent also observes the solid equitable roots of an accounting for profits, *post*, at 3; accord, *infra*, at 6 (discussing the equitable origins of the accounting remedy), a remedy closely resembling disgorgement, see *infra*, at 8–9.  In any event, casting aside a form of relief solely "based on the particular label affixed to [it] would 'elevate form over substance,'" *Aetna Health Inc.* v. *Davila*, 542 U. S. 200, 214 (2004), leaving unresolved the question before us: whether the underlying profits-based award conforms to equity practice.

### B

The SEC action and disgorgement award at issue here arise from a scheme to defraud foreign nationals. Petitioners Charles Liu and his wife, Xin (Lisa) Wang, solicited nearly $27 million from foreign investors under the EB–5 Immigrant Investor Program (EB–5 Program). 754 Fed. Appx. 505, 506 (CA9 2018) (case below). The EB–5 Program, administered by the U. S. Citizenship and Immigration Services, permits noncitizens to apply for permanent residence in the United States by investing in approved commercial enterprises that are based on "proposals for promoting economic growth." See USCIS, EB–5 Immigrant Investor Program, https://www.uscis.gov/eb-5. Investments in EB–5 projects are subject to the federal securities laws.

Liu sent a private offering memorandum to prospective investors, pledging that the bulk of any contributions would go toward the construction costs of a cancer-treatment center. The memorandum specified that only amounts collected from a small administrative fee would fund "'legal, accounting and administration expenses.'" 754 Fed. Appx., at 507. An SEC investigation revealed, however, that Liu spent nearly $20 million of investor money on ostensible marketing expenses and salaries, an amount far more than what the offering memorandum permitted and far in excess of the administrative fees collected. 262 F. Supp. 3d 957, 960–964 (CD Cal. 2017). The investigation also revealed that Liu diverted a sizable portion of those funds to personal accounts and to a company under Wang's control. *Id.*, at 961, 964. Only a fraction of the funds were put toward a lease, property improvements, and a proton-therapy machine for cancer treatment. *Id.*, at 964–965.

The SEC brought a civil action against petitioners, alleging that they violated the terms of the offering documents by misappropriating millions of dollars. The District Court

found for the SEC, granting an injunction barring petitioners from participating in the EB–5 Program and imposing a civil penalty at the highest tier authorized. *Id.*, at 975, 976. It also ordered disgorgement equal to the full amount petitioners had raised from investors, less the $234,899 that remained in the corporate accounts for the project. *Id.*, at 975–976.

Petitioners objected that the disgorgement award failed to account for their business expenses. The District Court disagreed, concluding that the sum was a "reasonable approximation of the profits causally connected to [their] violation." *Ibid.* The court ordered petitioners jointly and severally liable for the full amount that the SEC sought. App. to Pet. for Cert. 62a.

The Ninth Circuit affirmed. It acknowledged that *Kokesh* "expressly refused to reach" the issue whether the District Court had the authority to order disgorgement. 754 Fed. Appx., at 509. The court relied on Circuit precedent to conclude that the "proper amount of disgorgement in a scheme such as this one is the entire amount raised less the money paid back to the investors." *Ibid.*; see also *SEC* v. *JT Wallenbrock & Assocs.*, 440 F. 3d 1109, 1113, 1114 (CA9 2006) (reasoning that it would be "unjust to permit the defendants to offset . . . the expenses of running the very business they created to defraud . . . investors").

We granted certiorari to determine whether §78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing. 589 U. S. ___ (2019).

## II

Our task is a familiar one. In interpreting statutes like §78u(d)(5) that provide for "equitable relief," this Court analyzes whether a particular remedy falls into "those categories of relief that were *typically* available in equity." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256 (1993); see also *CIGNA Corp.* v. *Amara*, 563 U. S. 421, 439 (2011);

*Montanile* v. *Board of Trustees of Nat. Elevator Industry Health Benefit Plan*, 577 U. S. 136, 142 (2016). The "basic contours of the term are well known" and can be discerned by consulting works on equity jurisprudence. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 217 (2002).

These works on equity jurisprudence reveal two principles. First, equity practice long authorized courts to strip wrongdoers of their ill-gotten gains, with scholars and courts using various labels for the remedy. Second, to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.

### A

Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names. Compare, *e.g.*, 1 D. Dobbs, Law of Remedies §4.3(5), p. 611 (1993) ("Accounting holds the defendant liable for his profits"), with *id.*, §4.1(1), at 555 (referring to "restitution" as the relief that "measures the remedy by the defendant's gain and seeks to force disgorgement of that gain"); see also Restatement (Third) of Restitution and Unjust Enrichment §51, Comment *a*, p. 204 (2010) (Restatement (Third)) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profits'"); 1 J. Pomeroy, Equity Jurisprudence §101, p. 112 (4th ed. 1918) (describing an accounting as an equitable remedy for the violation of strictly legal primary rights).

No matter the label, this "profit-based measure of unjust enrichment," Restatement (Third) §51, Comment *a*, at 204, reflected a foundational principle: "[I]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong," *Root* v. *Railway Co.,* 105 U. S. 189, 207 (1882). At

the same time courts recognized that the wrongdoer should not profit "by his own wrong," they also recognized the countervailing equitable principle that the wrongdoer should not be punished by "pay[ing] more than a fair compensation to the person wronged." *Tilghman* v. *Proctor*, 125 U. S. 136, 145–146 (1888).

Decisions from this Court confirm that a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts. In *Porter* v. *Warner Holding Co.*, 328 U. S. 395 (1946), the Court interpreted a section of the Emergency Price Control Act of 1942 that encompassed a "comprehensiv[e]" grant of "equitable jurisdiction." *Id.*, at 398. "[O]nce [a District Court's] equity jurisdiction has been invoked" under that provision, the Court concluded, "a decree compelling one to disgorge profits . . . may properly be entered." *Id.*, at 398–399.

Subsequent cases confirm the "'protean character' of the profits-recovery remedy." *Petrella* v. *Metro-Goldwyn-Mayer, Inc.*, 572 U. S. 663, 668, n. 1 (2014). In *Tull* v. *United States*, 481 U. S. 412 (1987), the Court described "disgorgement of improper profits" as "traditionally considered an equitable remedy." *Id.*, at 424. While the Court acknowledged that disgorgement was a "limited form of penalty" insofar as it takes money out of the wrongdoer's hands, it nevertheless compared disgorgement to restitution that simply "'restor[es] the status quo,'" thus situating the remedy squarely within the heartland of equity. *Ibid.*[2]

———————

[2] The dissent acknowledges that this Court has "referred to disgorgement as an equitable remedy in some of its prior decisions." *Post*, at 6 (citing *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 352 (1998)). While the dissent attempts to discount those cases for having "merely referred to the term" only "in passing," *post*, at 6, those cases expressly "characterized as equitable . . . actions for disgorgement of improper profits" in analyzing whether certain remedies were traditionally available in equity, *Feltner*, 523 U. S., at 352 (citing *Teamsters* v. *Terry*, 494 U. S. 558, 570 (1990) ("characteriz[ing] damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper

In *Great-West*, the Court noted that an "accounting for profits" was historically a "form of equitable restitution." 534 U. S., at 214, n. 2. And in *Kansas* v. *Nebraska*, 574 U. S. 445 (2015), a "'basically equitable'" original jurisdiction proceeding, the Court ordered disgorgement of Nebraska's gains from exceeding its allocation under an interstate water compact. *Id.*, at 453, 475.

Most recently, in *SCA Hygiene Products Aktiebolag* v. *First Quality Baby Products, LLC*, 580 U. S. ___ (2017), the Court canvassed pre-1938 patent cases invoking equity jurisdiction. It noted that many cases sought an "accounting," which it described as an equitable remedy requiring disgorgement of ill-gotten profits. *Id.*, at ___ (slip op., at 11). This Court's "transsubstantive guidance on broad and fundamental" equitable principles, *Romag Fasteners, Inc.* v. *Fossil Group, Inc.*, 590 U. S. ___, ___ (2020) (slip op., at 5), thus reflects the teachings of equity treatises that identify a defendant's net profits as a remedy for wrongdoing.

Contrary to petitioners' argument, equity courts did not limit this remedy to cases involving a breach of trust or of fiduciary duty. Brief for Petitioners 28–29. As petitioners acknowledge, courts authorized profits-based relief in patent-infringement actions where no such trust or special relationship existed. *Id.*, at 29; see also *Root*, 105 U. S., at 214 ("[I]t is nowhere said that the patentee's right to an account is based upon the idea that there is a fiduciary relation created between him and the wrong-doer by the fact of infringement").

Petitioners attempt to distinguish these patent cases by suggesting that an "accounting" was appropriate only because Congress explicitly conferred that remedy by statute in 1870. Brief for Petitioners 29 (citing the Act of July 8, 1870, §55, 16 Stat. 206). But patent law had not previously deviated from the general principles outlined above: This

―――――――

profits'"); *Tull*, 481 U. S., at 424).

Court had developed the rule that a plaintiff may "recover the amount of . . . profits that the defendants have made by the use of his invention" through "a series of decisions under the patent act of 1836, which simply conferred upon the courts of the United States general equity jurisdiction . . . in cases arising under the patent laws." *Tilghman*, 125 U. S., at 144. The 1836 statute, in turn, incorporated the substance of an earlier statute from 1819 which granted courts the ability to "proceed according to the course and principles of courts of equity" to "prevent the violation of patent-rights." *Root*, 105 U. S., at 193. Thus, as these cases demonstrate, equity courts habitually awarded profits-based remedies in patent cases well before Congress explicitly authorized that form of relief.

B

While equity courts did not limit profits remedies to particular types of cases, they did circumscribe the award in multiple ways to avoid transforming it into a penalty outside their equitable powers. See *Marshall*, 15 Wall., at 149.

For one, the profits remedy often imposed a constructive trust on wrongful gains for wronged victims. The remedy itself thus converted the wrongdoer, who in many cases was an infringer, "into a trustee, as to those profits, for the owner of the patent which he infringes." *Burdell* v. *Denig,* 92 U. S. 716, 720 (1876). In "converting the infringer into a trustee for the patentee as regards the profits thus made," the chancellor "estimat[es] the compensation due from the infringer to the patentee." *Packet Co.* v. *Sickles*, 19 Wall. 611, 617–618 (1874); see also *Clews* v. *Jamieson*, 182 U. S. 461, 480 (1901) (describing an accounting as involving a "'distribution of the trust moneys among all the beneficiaries who are entitled to share therein'" in an action against the governing committee of a stock exchange).

Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted

wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory. See *Ambler* v. *Whipple*, 20 Wall. 546, 559 (1874) (ordering an accounting against a partner who had "knowingly connected himself with and aided in . . . fraud"). In *Elizabeth* v. *Pavement Co.*, 97 U. S. 126 (1878), for example, a city engaged contractors to install pavement in a manner that infringed a third party's patent. The patent holder brought a suit in equity to recover profits from both the city and its contractors. The Court held that only the contractors (the only parties to make a profit) were responsible, even though the parties answered jointly. *Id.*, at 140; see also *ibid.* (rejecting liability for an individual officer who merely acted as an agent of the defendant and received a salary for his work). The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits. See, *e.g.*, *Belknap* v. *Schild*, 161 U. S. 10, 25–26 (1896) ("The defendants, in any such suit, are therefore liable to account for such profits only as have accrued to themselves from the use of the invention, and not for those which have accrued to another, and in which they have no participation"); *Keystone Mfg. Co.* v. *Adams*, 151 U. S. 139, 148 (1894) (reversing profits award that was based not on what defendant had made from infringement but on what third persons had made from the use of the invention); *Jennings* v. *Carson*, 4 Cranch 2, 21 (1807) (holding that an order requiring restitution could not apply to "those who were not in possession of the thing to be restored" and "had no power over it") (citing *Penhallow* v. *Doane's Administrators*, 3 Dall. 54 (1795) (reversing a restitution award in admiralty that ordered joint damages in excess of what each defendant received)).

Finally, courts limited awards to the net profits from wrongdoing, that is, "the gain made upon any business or investment, when both the receipts and payments are taken into the account." *Rubber Co.* v. *Goodyear*, 9 Wall.

788, 804 (1870); see also *Livingston* v. *Woodworth*, 15 How. 546, 559–560 (1854) (restricting an accounting remedy "to the actual gains and profits . . . during the time" the infringing machine "was in operation and during no other period" to avoid "convert[ing] a court of equity into an instrument for the punishment of simple torts"); *Seymour* v. *McCormick*, 16 How. 480, 490 (1854) (rejecting a blanket rule that infringing one component of a machine warranted a remedy measured by the full amounts of the profits earned from the machine); *Mowry* v. *Whitney*, 14 Wall. 620, 649 (1872) (vacating an accounting that exceeded the profits from infringement alone); *Wooden-Ware Co.* v. *United States,* 106 U. S. 432, 434–435 (1882) (explaining that an innocent trespasser is entitled to deduct labor costs from the gains obtained by wrongfully harvesting lumber).

The Court has carved out an exception when the "entire profit of a business or undertaking" results from the wrongful activity. *Root*, 105 U. S., at 203. In such cases, the Court has explained, the defendant "will not be allowed to diminish the show of profits by putting in unconscionable claims for personal services or other inequitable deductions." *Ibid.* In *Goodyear*, for example, the Court affirmed an accounting order that refused to deduct expenses under this rule. The Court there found that materials for which expenses were claimed were bought for the purposes of the infringement and "extraordinary salaries" appeared merely to be "dividends of profit under another name." 9 Wall.*,* at 803; see also *Callaghan* v. *Myers*, 128 U. S. 617, 663–664 (1888) (declining to deduct a defendant's personal and living expenses from his profits from copyright violations, but distinguishing the expenses from salaries of officers in a corporation).

Setting aside that circumstance, however, courts consistently restricted awards to net profits from wrongdoing after deducting legitimate expenses. Such remedies, when assessed against only culpable actors and for victims, fall

comfortably within "those categories of relief that were *typically* available in equity." *Mertens*, 508 U. S., at 256.

C

By incorporating these longstanding equitable principles into §78u(d)(5), Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing. To be sure, the SEC originally endeavored to conform its disgorgement remedy to the common-law limitations in §78u(d)(5). Over the years, however, courts have occasionally awarded disgorgement in three main ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement liability, and declining to deduct even legitimate expenses from the receipts of fraud.[3] The SEC's disgorgement remedy in such incarnations is in considerable tension with equity practices.

Petitioners go further. They claim that this Court effectively decided in *Kokesh* that disgorgement is necessarily a penalty, and thus not the kind of relief available at equity. Brief for Petitioners 19–20, 22–26. Not so. *Kokesh* expressly declined to pass on the question. 581 U. S., at ___, n. 3 (slip op., at 5, n. 3). To be sure, the *Kokesh* Court evaluated a version of the SEC's disgorgement remedy that seemed to exceed the bounds of traditional equitable principles. But that decision has no bearing on the SEC's ability

———————

[3] See, *e.g.*, *SEC* v. *Clark*, 915 F. 2d 439, 441, 454 (CA9 1990) (requiring defendant to disgorge the profits that his stockbroker made from unlawful trades); *SEC* v. *Brown*, 658 F. 3d 858, 860–861 (CA8 2011) (*per curiam*) (ordering joint-and-several disgorgement of funds collected from investors and concluding that "'the overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses'"); *SEC* v. *Contorinis*, 743 F. 3d 296, 304–306 (CA2 2014) (requiring defendant to disgorge benefits conferred on close associates).

to conform future requests for a defendant's profits to the limits outlined in common-law cases awarding a wrong-doer's net gains.

The Government, for its part, contends that the SEC's interpretation of the equitable disgorgement remedy has Congress' tacit support, even if it exceeds the bounds of equity practice. Brief for Respondent 13–21. It points to the fact that Congress has enacted a number of other statutes referring to "disgorgement."

That argument attaches undue significance to Congress' use of the term. It is true that Congress has authorized the SEC to seek "disgorgement" in administrative actions. 15 U. S. C. §77h–1(e) ("In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement"). But it makes sense that Congress would expressly name the equitable powers it grants to an agency for use in administrative proceedings. After all, agencies are unlike federal courts where, "[u]nless otherwise provided by statute, all . . . inherent equitable powers . . . are available for the proper and complete exercise of that jurisdiction." *Porter*, 328 U. S., at 398.

Congress does not enlarge the breadth of an equitable, profit-based remedy simply by using the term "disgorgement" in various statutes. The Government argues that under the prior-construction principle, Congress should be presumed to have been aware of the scope of "disgorgement" as interpreted by lower courts and as having incorporated the (purportedly) prevailing meaning of the term into its subsequent enactments. Brief for Respondent 24. But "that canon has no application" where, among other things, the scope of disgorgement was "far from 'settled.'" *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 330 (2015).

At bottom, even if Congress employed "disgorgement" as a shorthand to cross-reference the relief permitted by §78u(d)(5), it did not silently rewrite the scope of what the

SEC could recover in a way that would contravene limitations embedded in the statute. After all, such "statutory reference[s]" to a remedy grounded in equity "must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes." *Great-West*, 534 U. S., at 211, n. 1. Accordingly, Congress' own use of the term "disgorgement" in assorted statutes did not expand the contours of that term beyond a defendant's net profits—a limit established by longstanding principles of equity.

## III

Applying the principles discussed above to the facts of this case, petitioners briefly argue that their disgorgement award is unlawful because it crosses the bounds of traditional equity practice in three ways: It fails to return funds to victims, it imposes joint-and-several liability, and it declines to deduct business expenses from the award. Because the parties focused on the broad question whether any form of disgorgement may be ordered and did not fully brief these narrower questions, we do not decide them here. We nevertheless discuss principles that may guide the lower courts' assessment of these arguments on remand.

## A

Section 78u(d)(5) restricts equitable relief to that which "may be appropriate or necessary for the benefit of investors." The SEC, however, does not always return the entirety of disgorgement proceeds to investors, instead depositing a portion of its collections in a fund in the Treasury. See SEC, Division of Enforcement, 2019 Ann. Rep. 16–17, https://www.sec.gov/files/enforcement-annual-report-2019.pdf. Congress established that fund in the Dodd-Frank Wall Street Reform and Consumer Protection Act for disgorgement awards that are not deposited in "disgorgement fund[s]" or otherwise "distributed to victims." 124

Stat. 1844. The statute provides that these sums may be used to pay whistleblowers reporting securities fraud and to fund the activities of the Inspector General. *Ibid.* Here, the SEC has not returned the bulk of funds to victims, largely, it contends, because the Government has been unable to collect them.[4]

The statute provides limited guidance as to whether the practice of depositing a defendant's gains with the Treasury satisfies the statute's command that any remedy be "appropriate or necessary for the benefit of investors." The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit. After all, the Government has pointed to no analogous common-law remedy permitting a wrongdoer's profits to be withheld from a victim indefinitely without being disbursed to known victims. Cf. *Root*, 105 U. S., at 214–215 (comparing the accounting remedy to a breach-of-trust action, where a court would require the defendant to "refund the amount of profit which they have actually realized").

The Government maintains, however, that the primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution. See, *e.g.*, SEC, Report Pursuant to Section 308(C) of the Sarbanes Oxley Act of 2002, p. 3, n. 2 (2003) (taking the position that disgorgement is not intended to make investors whole, but rather to deprive wrongdoers of ill-gotten gains); see also 6 T. Hazen, Law of Securities Regulation §16.18, p. 8 (rev. 7th ed. 2016) (concluding that the remedial nature of the disgorgement remedy does not mean that it is essentially compensatory and

--------------------

[4] According to the Government, petitioners "transferred the bulk of their misappropriated funds to China, defied the district court's order to repatriate those funds, and fled the United States." Brief for Respondent 36.

concluding that the "primary function of the remedy is to deny the wrongdoer the fruits of ill-gotten gains"). Under the Government's theory, the very fact that it conducted an enforcement action satisfies the requirement that it is "appropriate or necessary for the benefit of investors."

But the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless the latter part of §78u(d)(5). Indeed, this Court concluded similarly in *Mertens* when analyzing statutory language accompanying the term "equitable remedy." 508 U. S., at 253 (interpreting the term "appropriate equitable relief"). There, the Court found that the additional statutory language must be given effect since the section "does not, after all, authorize . . . 'equitable relief' *at large*." *Ibid.* As in *Mertens*, the phrase "appropriate or necessary for the benefit of investors" must mean something more than depriving a wrongdoer of his net profits alone, else the Court would violate the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Parker Drilling Management Services, Ltd.* v. *Newton*, 587 U. S. ___, ___ (2019) (slip op., at 9) (internal quotation marks omitted).

The Government additionally suggests that the SEC's practice of depositing disgorgement funds with the Treasury may be justified where it is infeasible to distribute the collected funds to investors.[5] Brief for Respondent 37. It is an open question whether, and to what extent, that practice nevertheless satisfies the SEC's obligation to award relief

_____

[5] We express no view as to whether the SEC has offered adequate proof of failed attempts to return funds to investors here. To the extent that feasibility is relevant at all to equitable principles, we observe that lower courts are well equipped to evaluate the feasibility of returning funds to victims of fraud. See, *e.g.*, *SEC* v. *Lund*, 570 F. Supp. 1397, 1404–1405 (CD Cal. 1983) (appointing a magistrate judge to determine whether it was feasible to locate victims of financial wrongdoing).

"for the benefit of investors" and is consistent with the limitations of §78u(d)(5). The parties have not identified authorities revealing what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims. But we need not address the issue here. The parties do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by §78u(d)(5) and consistent with equitable principles.

B

The SEC additionally has sought to impose disgorgement liability on a wrongdoer for benefits that accrue to his affiliates, sometimes through joint-and-several liability, in a manner sometimes seemingly at odds with the common-law rule requiring individual liability for wrongful profits. See, *e.g.*, *SEC* v. *Contorinis*, 743 F. 3d 296, 302 (CA2 2014) (holding that a defendant could be forced to disgorge not only what he "personally enjoyed from his exploitation of inside information, but also the profits of such exploitation that he channeled to friends, family, or clients"); *SEC* v. *Clark*, 915 F. 2d 439, 454 (CA9 1990) ("It is well settled that a tipper can be required to disgorge his tippee's profits"); *SEC* v. *Whittemore*, 659 F. 3d 1, 10 (CADC 2011) (approving joint-and-several disgorgement liability where there is a close relationship between the defendants and collaboration in executing the wrongdoing).

That practice could transform any equitable profits-focused remedy into a penalty. Cf. *Marshall*, 15 Wall., at 149. And it runs against the rule to not impose joint liability in favor of holding defendants "liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no

participation." *Belknap*, 161 U. S., at 25–26; see also *Elizabeth* v. *Pavement Co.*, 97 U. S. 126 (1878).

The common law did, however, permit liability for partners engaged in concerted wrongdoing. See, *e.g.*, *Ambler*, 20 Wall., at 559. The historic profits remedy thus allows some flexibility to impose collective liability. Given the wide spectrum of relationships between participants and beneficiaries of unlawful schemes—from equally culpable codefendants to more remote, unrelated tipper-tippee arrangements—the Court need not wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals.

Here, petitioners were married. 754 Fed. Appx. 505; 262 F. Supp. 3d, at 960–961. The Government introduced evidence that Liu formed business entities and solicited investments, which he misappropriated. *Id.*, at 961. It also presented evidence that Wang held herself out as the president, and a member of the management team, of an entity to which Liu directed misappropriated funds. *Id.*, at 964. Petitioners did not introduce evidence to suggest that one spouse was a mere passive recipient of profits. Nor did they suggest that their finances were not commingled, or that one spouse did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust. Cf. *SEC* v. *Hughes Capital Corp.*, 124 F. 3d 449, 456 (CA3 1997) (finding that codefendant spouse was liable for unlawful proceeds where they funded her "lavish lifestyle"). We leave it to the Ninth Circuit on remand to determine whether the facts are such that petitioners can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required.

## C

Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when

both the receipts and payments are taken into the account." *Goodyear*, 9 Wall., at 804; see also Restatement (Third) §51, Comment *h*, at 216 (reciting the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement). Accordingly, courts must deduct legitimate expenses before ordering disgorgement under §78u(d)(5). A rule to the contrary that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery." *Tilghman*, 125 U. S., at 145–146; cf. *SEC* v. *Brown*, 658 F. 3d 858, 861 (CA8 2011) (declining to deduct even legitimate expenses like payments to innocent third-party employees and vendors).

The District Court below declined to deduct expenses on the theory that they were incurred for the purposes of furthering an entirely fraudulent scheme. It is true that when the "entire profit of a business or undertaking" results from the wrongdoing, a defendant may be denied "inequitable deductions" such as for personal services. *Root*, 105 U. S., at 203. But that exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains "under another name." *Goodyear*, 9 Wall., at 803. Doing so will ensure that any disgorgement award falls within the limits of equity practice while preventing defendants from profiting from their own wrong. *Root*, 105 U. S., at 207.

Although it is not necessary to set forth more guidance addressing the various circumstances where a defendant's expenses might be considered wholly fraudulent, it suffices to note that some expenses from petitioners' scheme went toward lease payments and cancer-treatment equipment. Such items arguably have value independent of fueling a fraudulent scheme. We leave it to the lower court to examine whether including those expenses in a profits-based

remedy is consistent with the equitable principles underlying §78u(d)(5).

\*    \*    \*

For the foregoing reasons, we vacate the judgment below and remand the case to the Ninth Circuit for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–1501

_____

## CHARLES C. LIU, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2020]

JUSTICE THOMAS, dissenting.

The Court correctly declines to affirm the Ninth Circuit's decision upholding the District Court's disgorgement order, but I disagree with the Court's decision to vacate and remand for the lower courts to "limi[t]" the disgorgement award. *Ante,* at 1. Disgorgement can never be awarded under 15 U. S. C. §78u(d)(5). That statute authorizes the Securities and Exchange Commission (SEC) to seek only "equitable relief that may be appropriate or necessary for the benefit of investors," and disgorgement is not a traditional equitable remedy. Thus, I would reverse the judgment of the Court of Appeals.

## I

The Securities Exchange Act of 1934, as amended in 2005, allows the SEC to request "equitable relief" in federal district court against those who violate federal securities laws. §78u(d)(5). According to our usual interpretive convention, "equitable relief" refers to forms of equitable relief available in the English Court of Chancery at the time of the founding. Because disgorgement is a creation of the 20th century, it is not properly characterized as "equitable relief," and, hence, the District Court was not authorized to award it under §78u(d)(5).

A

"This Court has never treated general statutory grants of equitable authority as giving federal courts a freewheeling power to fashion new forms of equitable remedies." *Trump* v. *Hawaii*, 585 U. S. \_\_\_, \_\_\_ (2018) (THOMAS, J., concurring) (slip op., at 3). "Rather, it has read such statutes as constrained by 'the body of law which had been transplanted to this country from the English Court of Chancery' in 1789." *Ibid.* (quoting *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 105 (1945)). As Justice Story put it, "the settled doctrine of this court is, that the remedies in equity are to be administered . . . according to the practice of courts of equity in [England], as contradistinguished from that of courts of law; subject, of course to the provisions of the acts of congress." *Boyle* v. *Zacharie & Turner*, 6 Pet. 648, 654 (1832).

We have interpreted other statutes according to this "settled doctrine." For example, we have read the term "equitable relief" in the Employee Retirement Income Security Act of 1974 to refer to "those categories of relief that were typically available in equity." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256 (1993) (emphasis deleted). We have done the same for the Judiciary Act of 1789, see, *e.g.*, *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318–319 (1999), and for provisions in the Bankruptcy Code, see *Taggart* v. *Lorenzen*, 587 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 5). There is nothing about §78u(d)(5) that counsels departing from this approach.

B

Disgorgement is not a traditional form of equitable relief. Rather, cases, legal dictionaries, and treatises establish that it is a 20th-century invention.

As an initial matter, it is not even clear what "disgorgement" means. The majority frankly acknowledges its "'"protean character."'" *Ante*, at 7 (quoting *Petrella* v.

*Metro-Goldwyn-Mayer, Inc.*, 572 U. S. 663, 688, n. 1 (2014)). The difficulty of defining this supposedly traditional remedy is the first sign that it is not a historically recognized equitable remedy. In contrast, an accounting for profits, or accounting—a distinct form of relief that the majority groups with disgorgement—has a well-accepted definition: It compels a defendant to account for, and repay to a plaintiff, those profits that belong to the plaintiff in equity. Bray, Fiduciary Remedies, in The Oxford Handbook of Fiduciary Law 449 (E. Criddle, P. Miller, & R. Sitkoff eds. 2019). The definition of disgorgement, after today's decision, is a remedy that compels each defendant to pay his profits (and sometimes, though it is not clear when, all of his codefendants' profits) to a third-party Government agency (which sometimes, though it is not clear when, passes the money on to victims). This remedy has no basis in historical practice.

No published case appears to have used the term "disgorgement" to refer to equitable relief until the 20th century. Even then, the earliest cases use the word in a "nontechnical" sense, Brief for Law Professors as *Amici Curiae* 22, to describe the action a defendant must take when a party is awarded a traditional equitable remedy such as an accounting for profits or an equitable lien.[1] For example, in *Byrd* v. *Mullinix*, 159 Ark. 310, 251 S. W. 871 (1923), the Supreme Court of Arkansas affirmed the imposition of an equitable lien to prevent a debtor from "put[ting] the money in property which was itself beyond the reach of creditors, and to compel its disgorgement," *id.,* at 316–317, 251 S. W., at 872. Likewise, in *Armstrong* v. *Richards*, 128 Fla. 561, 175 So. 340 (1937), the Supreme Court of Florida referred to "the right of the taxpayer to require an accounting from

––––––––

[1] An equitable lien is imposed on a defendant's property "as security for a claim on the ground that otherwise the former would be unjustly enriched." Restatement of Restitution §161, p. 650 (1936).

and disgorgement by public officers and those in collusion with them," *id.*, at 564, 175 So., at 341. In these cases, the term "disgorgement" colloquially described what a defendant was ordered to do, not the remedy itself.

By the 1960s, published opinions began to use "disgorgement" to refer to a remedy in the administrative context. In *NLRB* v. *Local 176*, 276 F. 2d 583 (CA1 1960), the agency had "applied its . . . remedy of disgorgement of dues, requiring the union to refund to every member who had obtained employment on the Company project the dues which he had paid," *id.*, at 586 (footnote omitted). The court declined to enforce this part of the agency's order, but not because disgorgement was an impermissible form of relief. Instead, it found that, in the circumstances of the case, disgorgement "seem[ed] . . . to be an *ex post facto* penalty." *Ibid.*; see also *NLRB* v. *Local 111*, 278 F. 2d 823, 825 (CA1 1960) (enforcing a disgorgement order from the agency).

By the 1970s, courts started using the term "disgorgement" to describe a judicial remedy in its own right. When the SEC initially sought this kind of relief under the Securities Exchange Act in *SEC* v. *Texas Gulf Sulphur Co.*, 312 F. Supp. 77 (SDNY 1970), the District Court called it "restitution," *id.,* at 93, and the Court of Appeals called it "[r]estitution of [p]rofits," *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301, 1307 (CA2 1971) (emphasis deleted). Courts soon substituted the label "disgorgement." *SEC* v. *Manor Nursing Centers, Inc.*, 458 F. 2d 1082, 1105 (CA2 1972); *SEC* v. *Shapiro*, 349 F. Supp. 46, 55 (SDNY 1972).

The late date of these cases is sufficient reason to reject the argument that disgorgement is a traditional equitable remedy. But it is also telling that, when the SEC began seeking this relief, it did so without any statutory authority. Prior to 2005, the SEC lacked the power even to seek "equitable relief" in cases like this one. See §305(b), 116 Stat. 779 (amending the Securities Exchange Act). The District Court in *Texas Gulf Sulphur* purported to "imply [a] new

remed[y]," based on its "inherent equity power" and a belief that "the congressional purpose is effectuated by so doing." 312 F. Supp., at 91. But the sources it cited are dubious. The court relied on *J. I. Case Co.* v. *Borak*, 377 U. S. 426 (1964), a case about implied causes of action that we have since abrogated. See *Alexander* v. *Sandoval*, 532 U. S. 275, 287 (2001). It also relied on a securities law treatise that advocated for what it called "restitution" but admitted that district courts had no express authority to grant the remedy and that the SEC had never sought this remedy in the past. 3 L. Loss, Securities Regulation 1827–1828 (1961). It is functionally this same unauthorized remedy that the SEC and courts now call "disgorgement." The details have varied over time, but the lineage is clear: Disgorgement is "a relic of the heady days" of courts inserting judicially created relief into statutes. *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 75 (2001) (Scalia, J., concurring).

Disgorgement as a remedy in its own right is also absent from legal publications until the 20th century. Leading legal dictionaries did not define the term until the turn of the 20th century. See, *e.g.*, Merriam-Webster's Dictionary of Law 143 (1996); Black's Law Dictionary 480 (7th ed. 1999). Nor was disgorgement included in the first Restatement of Restitution, adopted in 1936. The remedy does not appear until the Third Restatement, adopted in 2010, which states that "[r]estitution remedies" that seek "to eliminate profit from wrongdoing . . . are often called 'disgorgement' or 'accounting.'" 2 Restatement (Third) of Restitution and Unjust Enrichment §51(4), p. 203. But "Restatement" is an inapt title for this edition of the treatise. Like many of the modern Restatements, its "authors have abandoned the mission of describing the law, and have chosen instead to set forth their aspirations for what the law ought to be." *Kansas* v. *Nebraska*, 574 U. S. 445, 475 (2015) (Scalia, J., concurring in part and dissenting in part). The inclusion of

"disgorgement" in the Third Restatement, which the majority cites in support of its holding, *ante*, at 6, represents a "'novel extension'" of equity. *Kansas*, *supra*, at 483 (THOMAS, J., concurring in part and dissenting in part) (quoting Roberts, Restitutionary Disgorgement for Opportunistic Breach of Contract and Mitigation of Damages, 42 Loyola (LA) L. Rev. 131, 134 (2008)).

I acknowledge that this Court has referred to disgorgement as an equitable remedy in some of its prior decisions. See, *e.g.*, *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 352 (1998). But these opinions merely referred to the term in passing without considering the question in depth. The history is clear: Disgorgement is not a form of relief that was available in the English Court of Chancery at the time of the founding.

C

The majority's treatment of disgorgement as an equitable remedy threatens great mischief. The term disgorgement itself invites abuse because it is a word with no fixed meaning. The majority sees "parallels" between accounting and disgorgement, *ante,* at 2, n. 1, but parallels are by definition not the same. Even if they were, the traditional remedy of an accounting—which compels a party to repay profits that belong to a plaintiff—has important conceptual limitations that disgorgement does not. An accounting connotes the relationship between a plaintiff and a defendant. In the words of one scholar, "it is an accounting by A to B." Bray, Fiduciary Remedies*,* at 454. But disgorgement connotes no relationship and so is not naturally limited to net profits and compensation of victims. It simply "is A disgorging." *Ibid.* Further, the traditional remedy of a constructive trust[2] or an equitable lien requires that the "money or prop-

_____

[2] A constructive trust compels a defendant "holding title to property . . . to convey it to another on the ground that he would be unjustly enriched

erty identified as belonging in good conscience to the plaintiff . . . clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 213 (2002). Disgorgement reaches further because it has no tracing requirement. By using a word with no history in equity jurisprudence, the SEC and courts have made it possible to circumvent the careful limitations imposed on other equitable remedies.

One need look no further than the SEC's use of disgorgement to see the pitfalls of the majority's acquiescence in its continued use as a remedy. The order in *Texas Gulf Sulphur* did not depart too far from equitable principles. The award was limited to the defendants' net profits and the funds were held in escrow and were at least partly available to compensate victims, 446 F. 2d, at 1307. It did not take long, however, for a district court to order a defendant to turn over both his profits and the investment "income earned on the proceeds." *Manor Nursing Centers*, 458 F. 2d, at 1105. And in the case before us today, just a half century later, disgorgement has expanded even further. The award is not limited to net profits or even money possessed by an individual defendant when it is imposed jointly and severally. See *ante*, at 5. And not only is it not guaranteed to be used to compensate victims, but the imposition of over $26 million in disgorgement and approximately $8 million in civil monetary penalties in this case seems to ensure that victims will be unable to recover anything in their own actions. As long as courts continue to award "disgorgement," both courts and the SEC will continue to have license to expand their own power.

The majority's decision to tame, rather than reject, disgorgement will also cause confusion in administrative prac-

---

if he were permitted to retain it." Restatement of Restitution §160, at 640–641.

tice. As the majority explains, the SEC is expressly author-
ized to impose "'disgorgement'" in its in-house tribunals.
*Ante*, at 13 (quoting 15 U. S. C. §77h–1(e)). It is unclear
whether the majority's new restrictions on disgorgement
will apply to these proceedings as well. If they do not, the
result will be that disgorgement has one meaning when the
SEC goes to district court and another when it proceeds in-
house.

More fundamentally, by failing to recognize that the
problem is disgorgement itself, the majority undermines
our entire system of equity. The majority believes that in-
sistence on the traditional rules of equity is unnecessarily
formalistic, *ante,* at 3, n. 1, but the Founders accepted fed-
eral equitable powers only because those powers depended
on traditional forms. The Constitution was ratified on the
understanding that equity was "a precise legal system"
with "specific equitable remed[ies]." *Missouri* v. *Jenkins*,
515 U. S. 70, 127 (1995) (THOMAS, J., concurring). "Alt-
hough courts of equity exercised remedial 'discretion,' that
discretion allowed them to deny or tailor a remedy despite
a demonstrated violation of a right, not to expand a remedy
beyond its traditional scope." *Trump*, 585 U. S., at ___
(THOMAS, J., concurring) (slip op., at 5). The majority, while
imposing some limits, ultimately permits courts to continue
expanding equitable remedies. I would simply hold that the
phrase "equitable relief" in §78u(d)(5) does not authorize
disgorgement.

## II

After holding that disgorgement is equitable relief, the
majority remands for the lower courts to reconsider the dis-
gorgement order in this case. If the majority is going to ac-
cept "disgorgement" as an available remedy, it should at
least limit the order to be consistent with the traditional
rules of equity. First, the order should be limited to each

petitioner's profits. Second, the order should not be imposed jointly and severally. Third, the money paid by petitioners should be used to compensate petitioners' victims.

## A

First, the disgorgement order should be limited to "the profits actually made" by each petitioner. *Mowry* v. *Whitney*, 14 Wall. 620, 649 (1872); see also *ante*, at 11, 18–20. Defendants in equity traditionally may deduct "allowances . . . for the cost and expense of the business" from the amount of the award. *Root* v. *Railway Co.*, 105 U. S. 189, 215 (1882); see also *Callaghan* v. *Myers*, 128 U. S. 617, 665 (1888); *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, 139 (1878); *Rubber Co.* v. *Goodyear*, 9 Wall. 788, 804 (1870). The rationale behind this rule is that "it is not the function of courts of equity to administer punishment." *Bangor Punta Operations, Inc.* v. *Bangor & Aroostook R. Co.*, 417 U. S. 703, 717–718, n. 14 (1974) (internal quotation marks omitted); see also 2 J. Story, Commentaries on Equity Jurisprudence §1494, p. 819 (13th ed. 1886). Here, however, the District Court reasoned that "it would be 'unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place.'" 754 Fed. Appx. 505, 509 (CA9 2018) (quoting *SEC* v. *J. T. Wallenbrock & Assocs.*, 440 F. 3d 1109, 1114 (CA9 2006)). On remand, the lower courts should limit the award to each petitioner's profits.

## B

Second, and relatedly, the disgorgement order should not be imposed jointly and severally. The majority analogizes disgorgement to accounting, *ante*, at 6, but this Court has rejected joint and several liability in actions for an accounting. *Elizabeth*, *supra,* at 139–140; *Keystone Mfg. Co.* v. *Adams*, 151 U. S. 139, 148 (1894); *Belknap* v. *Schild*, 161 U. S.

10, 25–26 (1896). The majority instructs the lower courts
to determine whether petitioners were "partners in wrong-
doing," apparently based on a case about the liability of
partners. *Ante,* at 10, 18 (citing *Ambler* v. *Whipple*, 20 Wall.
546 (1874)). But the liability in that case was premised on
the law of partnership, and nothing indicates that petition-
ers here were legal partners. The joint and several order in
this case is thus at odds with traditional equitable rules.[3]

C

Finally, the award should be used to compensate victims,
not to enrich the Government. Plaintiffs in equity may
claim "that which, *ex aequo et bono* [according to what is
equitable and good], is theirs, and nothing beyond this."
*Livingston* v. *Woodworth*, 15 How. 546, 560 (1854). The
money ordered to be paid as disgorgement in no sense be-
longs to the Government, and the majority cites no author-
ity allowing a Government agency to keep equitable relief
for a wrong done to a third party. Requiring the SEC to
only "generally" compensate victims, *ante,* at 15, is incon-
sistent with traditional equitable principles.

Worse still from a practical standpoint, the majority pro-
vides almost no guidance to the lower courts about how to
resolve this question on remand. Even assuming that dis-
gorgement is "equitable relief" for purposes of §78u(d)(5)
and that the Government may sometimes keep the money,

––––––––––

[3] For its part, respondent cites the joint and several liability in *Jackson*
v. *Smith,* 254 U. S. 586, 589 (1921), but the remedy in that case was a
constructive trust, see *Smith* v. *Jackson*, 48 App. D. C. 565, 576 (1919).
As explained above, there is no tracing requirement in the District
Court's order as would be required in a case of constructive trust. *Supra,*
at 6–7. The Court also allowed joint and several liability in *Belford* v.
*Scribner*, 144 U. S. 488 (1892), a copyright case. But it based its holding
on the fact that, under the relevant copyright statute, "both the printer
and the publisher are equally liable to the owner of the copyright for an
infringement." *Id.*, at 507; see also *Washingtonian Publishing Co.* v.
*Pearson*, 140 F. 2d 465, 467 (CADC 1944).

the Court should at least do more to identify the circumstances in which the Government may keep the money. Instead, the Court asks lower courts to improvise a solution. If past is prologue, this uncertainty is sure to create opportunities for the SEC to continue exercising unlawful power.

\*　　\*　　\*

I would reverse for the straightforward reason that disgorgement is not "equitable relief" within the meaning of §78u(d)(5). Because the majority acquiesces in the continued use of disgorgement under that statute, I respectfully dissent.